**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **EDWARD MEZA,** | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:16-CV-137** |
| | ) | |
| **CITY OF PORT ISABEL,** | ) | |
| **JOSE ZAMORA, an Individual,** | ) | |
| **MARTIN CANTU, an Individual,** | ) | |
| *Defendants.* | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' RULE 12 MOTION TO DISMISS AND PLAINTIFF'S REQUEST FOR DISCOVERY**

May It Please The Court,

NOW COMES THE PLAINTIFF, EDWARD MEZA, and files this Response to the Defendant's Rule 12 Motion to Dismiss, and requests discovery.

### I.      Background and Summary:

1.      On June 6, 2016, the Plaintiff filed their Original Complaint. The Complaint alleged in part that the Defendants had violated the Plaintiff's First Amendment Rights, and that the Defendants had breached their contract with the Plaintiff.

2.      On August 8, 2016, the Defendant's filed their Original Answer. On September 12, 2016, the Defendant's filed their Rule 12 Motion to Dismiss, arguing, in part, that the Plaintiff had failed to state a First Amendment claim upon which relief could be granted, that Defendants Cantu and Zamora were protected by qualified immunity, and the City of Port Isabel was immune from claims for intentional torts.

3.      Importantly, in their Motion to Dismiss the Defendants do not seek to dispose of all the Plaintiff's claims. The Motion to Dismiss does not attempt to dispose—and does offer any arguments to rebut—the Plaintiff's claim for breach of contract against the City of Port Isabel. The Plaintiff will

therefore not discuss this issue, except to note that when a municipality chooses to enter into contracts, it waives its sovereign immunity to lawsuits for the breach of those contracts.[1]

3.     Because the Plaintiff has stated a First Amendment Claim upon which relief should be granted, because Defendant's Cantu and Zamora are not protected by qualified immunity, and because the City of Port Isabel is not shielded by sovereign immunity, the Defendants' Motion should be denied.

4.     Further, because the reasonableness of the Defendants' actions are at issue, and because there is a question as to whether Defendant's Cantu and Zamora were performing a discretionary function of government during the events in question, discovery is necessary to resolve the issues of qualified immunity.

## II.     Statement of Fact:

1.     Plaintiff Edward Meza ("Meza") was the City Manager of Port Isabel from 2008 to his illegal termination on May 16, 2015. A longtime Port Isabel resident, Meza previously directed the Department of Historical Preservation, a position he held for eleven years. As City Manager, Meza was responsible for the appointment and management of non-elected city personnel, preparing budgets and submitting them to the City Commission, for keeping the City Commission advised on the overall financial condition and future needs of the City.[2]

2.     Meza excelled in his new role, and on July 6, 2010, the City awarded him an employee severance agreement (the "Agreement"). That Agreement, awarded "in the interest of encouraging Meza to continue the good services he has performed for the City," afforded Meza "a lump-sum cash severance payment […] in the full amount of his then full annual salary, in other words, in the amount of the then current one year's salary for the city manager."[3]

---

[1] A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter. *Tex. Loc. Gov't Code Ann.* § 271.152.
[2] **Exhibit 1**: Charter of Port Isabel, Article III, Section 3.01
[3] **Exhibit 2**: Minutes of July 6, 2010 Special Meeting and Severance Agreement

3.      In 2013, Meza learned that Defendant Martin Cantu and Juan Jose "JJ" Zamora ("City Defendants") were illegally profiting off of the city. The City Defendants directed (and, indeed, continue to order) municipal vehicles to the City Defendants' privately owned mechanic shops for maintenance and repairs, which was a misdemeanor offense and a direct violation of the City Charter. The City Defendants had full knowledge that their actions were improper. Not only were their actions criminal under the City Charter, but the City of Port Isabel Personnel Policies and Procedures required any public employee doing business with the City in any fashion to formally disclose that relationship to the City Secretary.[4] The City Defendants made no such disclosure, nor receive any official or non-official approval. Combined, Cantu and Zamora profited tens of thousands of dollars from Port Isabel in just a few short years.[5]

4.      Meza spoke informally with Public Works Director Balde Alaniz ("Alaniz") and Police Chief Gualberto Gonzalez ("Gonzalez"), who told Meza that the City Defendants insisted that municipal vehicles be brought to their repair shops.

5.      Lacking the authority to instruct Alaniz and Gonzalez not to send their vehicles to the repair shops owned by the City Defendants, Meza instead explained the relevant laws prohibiting elected officials from profiting off of the municipality in an attempt to dissuade the Department Heads from sending municipal vehicles to these Cantu and Zamora owned and operated businesses.

6.      Meza understood that he had no authority over the City Commissioners, and understood that investigations into these sorts of matters was outside his purview as City Manager. Therefore, all Meza could do was informally speak with the City Defendants and advise them of the relevant Port Isabel laws.

---

[4] **Exhibit 3**: City of Port Isabel Personnel Policies and Procedures Section 809
[5] **Exhibit 4:** Vendor Reports

7.      Meza communicated with City Commissioners Torres and Garza, as well as the Mayor of Port Isabel, about the continued illegality occurring. Because Meza had no authority or discretion to involve himself in these matters, he could do little more than attempt to persuade and inform.

8.      On March 3, 2015, an anonymous letter was sent to the City Commissioners and Meza.  A similar anonymous letter followed on April 8, 2015, a little over a month later. The letters alleged that certain Commissioners were "malfeasant in office." As malfeasance in office is outside the scope of the duties of the City Manager, Meza simply forwarded the letters along to the City Commissioners. It was then that Defendant Cantu confronted Meza, and in effect accused Meza of conspiring against him. Such an accusation was groundless, and was apparently based on Defendant Cantu's mistaken belief that Meza had withheld information from him about complaints regarding Defendant Cantu's illegal scheme.

9.      By that point, City Commissioner Guillermo Torres ("Torres") knew of the City Defendants' business activities of their illegal profiteering off of the City of Port Isabel. Interestingly, it was around this time that an ad attacking Torres and accusing him of financial misdeeds ran in the Port Isabel South Padre Press.[6] Although the ad was placed anonymously, the allegations within it were strikingly similar to the allegations the City Defendants would allege against Torres in their attempts to avoid responsibility for their corruption. Another similar ad would run on April 30, 2015.[7] Similar ads by the same shadowy group "Concerned Citizens of Port Isabel" would later publish ads attacking Plaintiff Meza.

10.     On April 13, 2015, Torres forced the City Commission to confront the City Defendants' prohibited self-dealing. After a thorough discussion, the City Defendants admitted that that they had instructed city vehicles to utilize their repair shops.[8]

---

[6] **Exhibit 5:** South Padre Press Excerpt, April 2nd 2015
[7] **Exhibit 6**: South Padre Press Excerpt, April 30th 2015
[8] **Exhibit 7**: Minutes of April 13, 2015 City Commission Meeting

11.     During the course of the meeting, in an attempt to stave off the decision of the City Commission, the City Defendants attempted to remove Torres from the City Commission. In what would become a recurring theme, the City Defendants claimed that their own actions were justified because Commissioner Torres had also engaged in self-enrichment. Defendant Cantu also questioned Meza about Torres, and essentially accused Meza of colluding with him.

12.     During this questioning, Meza spoke about the City Defendant's corruption, as well as Torres's alleged previous self-dealing. Defendant Zamora made a Motion to remove Torres from office, which Defendant Cantu immediately seconded. The Motion failed. The attempt by the City Defendants to remove Commissioner Torres is noteworthy, as the City Defendants would later claim that the City Commission did not have the authority to take the action against them that they attempted to first take against Commissioner Torres.

13.     At the conclusion of the discussion, and pursuant to the City Charter, the City Commissioners and the Mayor of Port Isabel voted to remove the City Defendants from the City Commission.[9]

14.     Two days later, on April 15, 2015, the City Defendants filed a lawsuit against the City of Port Isabel, the Mayor of Port Isabel, and the two remaining individual City Commissioners. They were represented by Gilberto Hinojosa ("Hinojosa"). Their Petition alleged that the Commission and the Mayor had no authority to remove the City Defendants, and further alleged that the provisions of the City Charter forbidding City Commissioners from profiting off of municipal contracts, jobs, works, or services were unconstitutional. Neither their Petition nor their Amended Petition cited any statutory authority or case law to support these positions.[10]

15.     On April 22, 2015, the 444th District Court of Cameron County restrained the City of Port Isabel from taking any action to remove the City Defendants, and further restrained the City of Port Isabel from holding any additional meetings of the City Commission until the Temporary Injunction

---

[9] Id
[10] **Exhibit 8**: Amended Petition in Cause No. 2015-DCL-2342

Hearing. Importantly, the Court also specifically restrained the City Defendants from calling a Special Meeting or taking any actions as City Commissioners.  On April 24, 2015, the 444th District Court heard the Plaintiffs' application for a Temporary Injunction, and heard Port Isabel's plea to the jurisdiction.

16.     During that hearing, Defendant Cantu again attempted to justify his actions—and to discredit Commissioner  Torres—by testifying that Torres had argued in favor of the City taking out a loan that would benefit him personally. Under directed questioning from Hinojosa, Cantu claimed that this took place during the Executive Session during of an organization called the Economic Development Corporation ("EDC"). Cantu further claimed that the Port Isabel City Attorney was in that meeting, and that the City Attorney made certain representations about Torres' supposed actions which indicated that Defendant Cantu's conduct was acceptable.[11]

17.     This testimony was blatant perjury. There was no such Executive Session in that meeting of the EDC, and the minutes of the meeting show that neither the City Attorney nor Defendant Cantu were even present at the meeting. Further, Torres had abstained during the vote on the item in question.[12]

18.     The waters were sufficiently muddied. The Court indicated that it would sign the Temporary Injunction Order while denying the plea to the jurisdiction. However, no Temporary Injunction Order was ever signed.

19.     The City of Port Isabel appealed the Order Denying the Pleas to the Jurisdiction on May 12, 2015, which should have automatically stayed any further action by the District Court. *Tex. Civ. Prac. Rem. Code* 51.014(b) ("An interlocutory appeal […] also stays all other proceedings in the trial court pending resolution of that appeal.").

---

[11] **Exhibit 9**: Excerpt of Hearing Transcript
[12] **Exhibit 10**: Minutes of EDC Meeting

20.     On Thursday, May 14, 2015, the City Defendants announced that they would hold a Special Meeting of the City Commission of Port Isabel for the express purpose of removing the City Attorney, Robert Collins, and Plaintiff Meza. The City Defendants called the meeting alone and with no other Commissioners in support.[13] The meeting was scheduled for Tuesday, May 19, 2015.

21.     The next day, Hinojosa filed a Notice of Nonsuit, which had the effect of both depriving the Appellate Court of jurisdiction and rendering the Temporary Restraining Order moot.

22.     No longer restrained from calling a meeting of the City Commission, the next day, Saturday, May 16, 2015, the City Defendants ordered that City employees unlock the doors to City Hall. The City Defendants then posted a Notice of Special Meeting, which stated that during a closed session, the City Defendants had "deliberate[d] the appoint, employment, evaluation, reassignment, duties, discipline, or dismissal" of the City Attorney, City Manager, and counsel for the City and that "action relative to the executive session" had been taken.[14]  The City Defendants announced to those present that Meza would be dismissed as City Manager, and that Jared Hockema, a longtime associate and friend of the City Defendants, had been named Interim City Manager.

23.     Even if the City Defendants were City Commissioners at this time, this meeting clearly violated the Texas Open Meetings Act.[15] There was no notice of this Saturday meeting, ensuring that neither the citizens of Port Isabel nor the Mayor, City Manager, or Commissioner Torres could attend.

24.     Incredibly, having first non-suited their case to circumvent the jurisdiction of the court, the City Defendants then filed a Motion to Reinstate. In an ex parte hearing, of which the City of Port Isabel was given no notice, the City Defendants obtained an order reinstating their lawsuit. The City Defendants, basing their authority to do so on the still unsigned Temporary Injunction Order, held an official meeting of the City Commission.

---

[13] **Exhibit 11**: Letter of May 14, 2015
[14] **Exhibit 12**: Notice of Special Meeting.
[15] "A governmental body shall give written notice of the date, hour, place, and subject of each meeting held by the governmental body[…]The notice of a meeting of a governmental body must be posted in a place readily accessible to the general public at all times for at least 72 hours before the scheduled time of the meeting." *Texas Open Meetings Act* Sec.551.041-Sec.551.043(a)

25.     That meeting was held on May 19, 2016. However, as noted above, the City Defendants had already announced Meza's termination. The City Defendants then, with the support of Commissioner Martinez, voted to dismiss the City Attorney, and proceeded to hire Gilberto Hinojosa—who had represented them in their lawsuit against Port Isabel—as the new City Attorney. That next week, on May 26, 2015, Hinojosa informed the City Commission that the City would not be honoring the Agreement with Meza, and the new City Commission voted to rescind the Agreement.

## II.     Arguments & Authority

### A.  The Plaintiff Is Entitled to Pursue a First Amendment Claim Against the City Defendants, Commissioners Cantu and Zamora

26.     Established Fifth Circuit law provides that an employee must show four elements to prevail on a First Amendment retaliation claim against an employer: (1) the employer took adverse action against the employee; (2) the speech was of public concern; (3) the interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) the speech was a motivating factor in the employer's action.

27.     The threshold question is whether the speaker made the speech as a private citizen, rather than as an employee pursuant to his official duties. In *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006), the United States Supreme Court held that in considering the second element—whether speech was of public concern—the reviewing court must shift its focus "from the content of the speech to the role of the speaker occupied when he said it." *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) (per curiam) (citing *Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958).  If the speaker is found to have made his speech as a citizen, then further inquiry must be made as to whether the speech addressed a matter of public concern, and then whether the interest of the employer in promoting efficiency of the services it performs through its employees outweighs the employees interests, as citizens, in commenting on a matter of public concern. *Pickering v. Board of Education*, 391 U.S. 563 (1968).

28.     There is no single dispositive test for whether a public employee is speaking as an employee or as a citizen. While the Supreme Court has made it clear that speech pursuant to one's official duties does not enjoy First Amendment protection, whether specific speech is made pursuant to those duties is not so easily ascertained. As the Court noted in *Garcetti* (a case in which the Plaintiff did not dispute that his expressions were made pursuant to his duties), the Supreme Court was given "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate" and therefore stated that "[t]he proper inquiry is a practical one." *Garcetti v. Ceballos,* 547 U.S. at 424.

29.     Defendants' Motion to Dismiss oversimplifies existing law in their argument that public employees do not enjoy First Amendment protection while on the job. "Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam). While the Defendants may wish to rid themselves of this suit and the facts contained therein, the First Amendment does protect a public employee's right, in certain circumstances, to speak as a citizen on matters of public concern. *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir.2007) (per curium).

### A.1. The Plaintiff's Speech Was Protected by the First Amendment

30.     In the instant case, Meza's speech—his statements to the City Commissioners and Mayor informing them of the corruption, and his statements while being questioned by Defendant Cantu— were not made pursuant to his duties as City Manager. These statements that Meza made were wholly outside the scope of his duties as City Manager. As outlined in the City Charter, the duties and authority of the City Manager are distinct and separate from those of the City Commission and are

primarily related to making budgets and hiring city employees.[16] The City Manager has no authority over the City Commission; the City Charter specifically grants the City Commission, not the City Manager, the authority to investigate and discipline City Commissioners.[17] Further, the City Manager is not entitled to investigate Port Isabel's financial transactions (or that of its government), nor is the City Manager entitled to investigate the conduct of any Port Isabel official or employee. The City Charter makes clear that such investigative powers lie solely with the City Commission. Indeed, as City Attorney Robert Collins noted in the April 13, 2015 meeting that resulted in the dismissal of the City Defendants, the City Manager does not have the authority to police office holders.

31.     So after terminating Plaintiff Meza for trying to speak up and do the right thing when doing so was not at all one of his job duties, the Defendants now wish to shut Meza up again by claiming that he had no right to say the things he did.

32.     While it is true that Meza was City Manager, and while it is true that the corruption related to the city, this is not determinative on whether a First Amendment claim can be made. As the Court noted in *Garcetti v. Ceballos*, it is not dispositive that the expression is made inside the office, or even that the expression is related to the speaker's job. *Garcetti v. Ceballos* 547 U.S. 410 (2006) (citing *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414 (1979)). In *Garcetti*, the Court held that it was speech made **pursuant** to one's duties that was exempt from First Amendment protection. "Pursuant" has been held to mean "[a]ctivities undertaken in the course of performing one's job." *Williams v. Dallas Indep. Sch. Dist*, 480 F.3d 689, 693 (5th Cir. 2007).

33.     In the instant case, Meza's comments about Defendant Cantu's and Zamora's corruption were outside the course of performing his job, and certainly was not made pursuant to his duties. Meza was, in effect, acting as if he was a hostile public citizen making allegations against the two Defendants based upon knowledge he had.

---

[16] Section 3.01(D) Duties of the city manager, City Charter of Port Isabel.
[17] Section 2.10, Investigation by city commission, City Charter of Port Isabel.

### A.2. The City Defendants Took Adverse Action against Meza in Retaliation

34.     That the City Defendants took adverse action against Meza is evident.

35.     He was terminated from his position in a hastily assembled "Special Meeting" that was called specifically to terminate him and the City Attorney. Never before his termination, did any Commissioner, mayor or city official cite Meza for any wrongdoing. Never did anyone warn Meza about any misconduct whatsoever.

36.     The timing and circumstances surrounding his dismissal clearly indicate that Meza was fired in retaliation for his statements about the City Defendants and their corrupt self-dealing.

### A.3. The Contents of Meza's Speech Were a Matter of Public Concern

37.     Meza's speech was certainly a matter of public concern.

38.     It is well-established that official misconduct is almost always a matter of public concern. *Charles v. Grief*, 522 F.3d 508, 514 (5th Cir.2008); see also *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir.2001); *see also Davis v. Ector County*, 40 F.3d 777, 782 (5th Cir. 1994) ("There is perhaps no subset of 'matters of public concern' more important than bringing official misconduct to light."); *see also Conway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import.").

### A.4. The City Defendants' Misdeeds Hindered, Not Promoted, City Efficiency

39.     The misdeeds of the City Defendants came at the expense of the tax-payers of Port Isabel, and their actions after their scheme was thwarted came at the expense of the municipal statutes of Port Isabel and the laws of the State of Texas.

40.     There was no efficiency in City Government that Meza's termination promoted, and absolutely no interest in efficiency forward by the City Defendant's illegal actions. To the contrary,

the City Defendant's scheme hindered the efficient repair and maintenance of city vehicles, while their actions after their scheme tied up the City Government in litigation at considerable expense.

41.     Meza is entitled to pursue a First Amendment claim entirely because: Meza's statements were not made pursuant to his position as City Manager; his statements were made on a matter of public concern and directly resulted in the City Defendants' retaliation; and the City Defendants' actions did nothing to advance the cause of governmental efficiency.

### B. The City Defendants Are Not Entitled to Qualified Immunity – Discovery is needed to resolve the issue of Qualified Immunity

42.     City Defendants' Motion fails to prove why the Court should recognize any qualified immunity for either Defendant.

43.     A qualified immunity defense "serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of then clearly established law." *Atteberry v. Nocona General Hosp.*, 430 F. 3d 245 (5th Circ.2005) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 456 (5th Cir.2001)).

44.     To overcome qualified immunity, a Plaintiff must show that there is sufficient evidence to raise a genuine issue of material fact as to whether a Defendant's conduct violated a Constitutional right. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir.2002) (en banc).

45.     In weighing the facts alleged, a court should view them in the light most favorable to the party asserting the injury. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

46.     A Plaintiff must also show that the Defendants' actions were objectively unreasonable in light of clearly established right at the time of the conduct in question. *Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir.2007). "The question [of] 'whether the ... right was clearly established at the time the defendant acted ... requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident.'" *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) (citing *Conroe Creosoting Co. v. Montgomery County*, 249 F.3d 337, 340 (5th Cir. 2001)).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009).

47.    Importantly, the "clearly established" standard does not mean that officials' conduct is protected by qualified immunity unless "the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 365 at 640 (1987). In addressing the two inquiries that determine whether qualified immunity exists, the Supreme Court held in *Pearson v. Callahan* that using the two-step analysis in sequence was not mandatory; rather, courts had the flexibility of deciding the question in either order. *Pearson v. Callahan*, 555 U.S. 223 (2009).

### B.1. There is Sufficient Evidence to Raise a Genuine Issue of Fact & the City Defendants' Conduct was Objectively Unreasonable

48.    In the instant case, and as outlined above, there is sufficient evidence to raise a genuine issue of fact as to whether the City Defendants violated the Plaintiff's First Amendment rights.

49.    Further, the facts of the case and the evidence presented clearly indicate that the actions of the City Defendants were illegal and unreasonable. Not only did the Saturday meeting which resulted in the Plaintiff's termination did not comply with the provisions of the Texas Open Meeting Act, but it was held for unreasonable purpose of forwarding the City Defendants' illegal activities.

50.    The basis of Meza's dismissal—that he had articulated the facts of the City Defendants' illegal scheme—is objectively unreasonable.

51.    No reasonable City Commissioner in the position of the City Defendants could have believed that the firing of a City Manager to cover one's criminal conduct was a reasonable or legal course of action. Indeed, in the aftermath of the events at issue the then-Mayor of Port Isabel and then-City Commissioner Garza, who both sat on the Commission during the time leading up to the Plaintiff's

dismissal, prepared affidavits speaking to the unreasonableness—and, indeed, illegality—of City Defendants' conduct.[18]

### B.2. Discovery Is Needed to Resolve the Qualified Immunity Issue

52.     However, there cannot be a full and complete understanding of whether the City Defendants are entitled to the defense of qualified immunity until the Plaintiff conducts limited discovery.

53.     First, in order to fully analyze the reasonableness of the City Defendants' actions, inquiry must be made into the circumstances surrounding their decisions. While the circumstantial evidence obviously tends to support an assertion that the City Defendants acted in a concerted effort to remove any and all individuals who had knowledge of, and objection to, their illegal scheme, limited discovery of their communications during this period, between themselves, Commissioner Martinez, and the now Interim City Manager, will provide tremendous insight.

54.     There is also a serious question, based on the evidence submitted and the facts alleged, as to whether or not the City Defendants were engaging in a discretionary function of government at all. In order to raise the defense of qualified immunity, the City Defendants must have been engaging in the performance of discretionary functions of government.

55.     Not all activities by government officials are discretionary, however. For example, a teacher who led his students in a moment of silent prayer was not entitled to raise qualified immunity as defense to suit because, as the court stated, "[e]mployment by a local, county, state, or federal government is not a carte blanche invitation to push the envelope." *Holloman v. Harland*, 370 F.3d 1252, 1282-84 (11th Cir. 2004). As the Eight Circuit noted in *Bergmann v. United States*, (speaking on the issue of what is discretionary and what is not) the "discretionary function exception inapplicable to allegations that government employees ignored or failed to comply with regulations or policies designed to guide their actions." 689 F.2d 789, 792 (8th Cir.1982)

---

[18] **Exhibit 13**: Affidavits of Vega and Garza

56.     If the City Defendants did indeed take the action of removing the Plaintiff to cover up (and enable them to continue) their illegal scheme, then this Court could reasonably conclude that their actions were no discretionary function of government at all.

57.     A limited discovery into the City Defendants communications, which will allow the court to determine their motivations and plans, is necessary to determine whether the City Defendants were acting in a truly governmental function or whether they were using the power of government for illegitimate means.

### C. The City of Port Isabel Cannot Claim Sovereign Immunity because offering a Severance Agreement is a Proprietary Function of Government

58.     The Texas Tort Claims Act provides only a limited waiver of immunity for governmental units, when those units are engaged in a governmental function. *Tex. Civ. Prac. & Rem. Code* §101.021.

59. However, when a municipality is engaged in a proprietary function, the Texas Tort Claims Act does not apply, and a municipality has no immunity. "In the realm of sovereign immunity as it applies to such political subdivisions—referred to as governmental immunity—this Court has distinguished between those acts performed as a branch of the state and those acts performed in a proprietary, non-governmental capacity […] we have long held that '[a] municipality is not immune from suit for torts committed in the performance of its proprietary functions, as it is for torts committed in the performance of its governmental functions.'" *Wasson Interests, Ltd. V. City of Jacksonville*, No. 14–0645, (Supreme Court of Texas, decided April 1, 2016 (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006)).

60. The question then becomes, what is a proprietary function and what is not? "Proprietary functions are those functions performed by a city, in its discretion, primarily for the benefit of those

within the corporate limits of the municipality." *Gates v. City of Dallas*, 704 SW 2d 737 (Tex. 1986) (internal citations omitted).

61. The Texas Constitution authorizes the State Legislature to "define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law." *Tex. Const*. Art. XI, § 13.

62. In passing the Texas Tort Claims Act, the State Legislature defined a proprietary function as one that a municipality may, in its discretion, perform in the interest of the inhabitants of the municipality. *Tex. Civ. Prac. & Rem. Code Ann*. § 101.0215(b). Governmental functions are defined as those functions "that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public." *Tex. Civ. Prac. & Rem. Code Ann*. § 101.0215(a).

63. The Legislature further notes thirty-six specific functions of municipalities that are "governmental" in nature, and the list gives a clear indication of the sorts of functions that are considered "governmental:" generally, as fits with their definition, they list as governmental those services which provide a benefit to the general public, such as trash collection, firefighting, and street construction. It seems clear that those services which do not benefit the public at large are proprietary. "The sovereign immunity of the state does not protect a municipality from liability for actions taken in a proprietary capacity because such are undertaken for the benefit of private enterprise or the residents of the municipality rather than for the benefit of the general public." *Houston v. Southwest Concrete Const.*, 835 S.W.2d 728 (Tex. App. 1992).

64. Offering a severance package is clearly a proprietary activity, not a governmental activity. Looking at the definition provided by the Legislature, offering an employee a severance package is

certainly not an activity "enjoined on the municipality by law…given to it by the state … to be exercised by the municipality in the interest of the general public."

65. The Agreement offered to Meza was for his benefit, not for the overall benefit of the general public. In *Gates v. City of Dallas*, the Supreme Court of Texas held that issuing an health insurance policy for Plaintiff Gates was a propriety function, stating that when the "[c]ity of Dallas entered into the insurance contract with Gates, it acted in its proprietary role and was 'clothed with the same authority and subject to the same liabilities as a private citizen.' " *704 SW 2d 737* (Tex. 1986) (quoting *Boiles v. City of Abilene*, 276 S.W.2d 922, 925 (Tex.Civ.App.—Eastland 1955, writ ref'd).

66. The issuance of an insurance contract is analogous to issuing a severance agreement: both are contracts between the municipality and individual employees of the municipality; neither contract was for the overall benefit of the citizens of the municipality, and the issuing of the contracts was not enjoined on the municipalities by the State of Texas. Indeed, offering contracts that do not benefit the public on the whole, but instead only provide a benefit to a few, is generally held to be a propriety function of government. See, e.g., *City of Houston v. Southwest Concrete Constr., Inc.*, 835 S.W.2d 728 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *Josephine E. Abercrombie Interests, Inc. v. City of Houston*, 830 S.W.2d 305 (Tex. App.—Corpus Christi 1992, writ denied); *City of Corpus Christi v. Absolute Industries*, 120 S.W.3d 1 (Tex. App.—Corpus Christi 2001, no pet.).

67. When the City of Port Isabel executed a severance agreement with Meza, it was performing a proprietary function of government. Therefore, the Texas Torts Claim Act does not apply, and the City of Port Isabel does not enjoy sovereign immunity for the fraudulent inducement of that contract.

### III.    CONCLUSION AND PRAYER

THEREFORE, for the foregoing reasons, the Plaintiffs hereby request that the Court find that:

1.   The Plaintiff may pursue their First Amendment claims against the City Defendants;

2.   That the City Defendants are not entitled to qualified immunity; or, in the alternative,

3. That limited discovery is necessary to resolve the issue of qualified immunity;

4. The Plaintiff may pursue their claim for fraud and fraudulent inducement against the City of Port Isabel.

The Plaintiff further requests such other and further relief to which the Plaintiff may be justly entitled.

Respectfully submitted,

**THE GOLDBERG LAW OFFICE, PLLC**

*/s/ Daniel J Goldberg*
Daniel Goldberg
Federal Bar No.:  866400
TBN:  24052856
2006 Commonwealth Street
Houston, Texas 77006
P: 713-942-0600
F: 713-942-0601
DJG@LawGoldberg.com

**ATTORNEY FOR PLAINTIFF,
EDWARD MEZA**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and forgoing instrument, "Plaintiff's Response in Opposition to Defendants' Motion to Dismiss & Plaintiff's Request for Limited discovery," was been served on Defendants, by and through their attorney of record, Ricardo Navarro & Robert Drinkard, Sent via ECF/Pacer system on this the 21st of October, 2016.

*/s/ Daniel J Goldberg*
Daniel Goldberg